IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Jacksonville Division

| | | |
|---|---|---|
| FLORIDA EAST COAST HOLDINGS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| LEXINGTON INSURANCE COMPANY d/b/a AMERICAN INTERNATIONAL GROUP, INC., ASPEN SPECIALITY HOUSTON CASUALTY, ALLIED WORLD, INDIAN HARBOR (XL), and IRONSHORE SPECIALTY, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Florida East Coast Holdings Corporation ("FEC"), by counsel, sets forth the following as its Complaint against Defendants Lexington Insurance Company ("Lexington") d/b/a American International Group, Inc. ("AIG"), Aspen Specialty, Houston Casualty, Allied World, Indian Harbor (XL), and Ironshore Specialty (collectively the "Insurers").

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter under 28 U.S.C. § 1332 as this dispute is between citizens of different states and the amount in controversy exceeds $75,000.

2.      Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the acts or omissions giving rise to the breach of insurance contracts occurred in Jacksonville, FL. Additionally, the insurance agreement at issue were delivered to FEC in Jacksonville, FL.

## PARTIES

3.      FEC owns the Florida East Coast Railway ("FEC Railway"), which is a Class II regional railroad that operates a 351-mile freight rail system located along the east coast of Florida. FEC Railway connects to the national railway system in Jacksonville, allowing it to provide rail service in and out of Georgia, Tennessee, South Carolina, and North Carolina, into and out of Florida's east coast. Based in Jacksonville, FEC Railway provides end-to-end intermodal and carload solutions to customers who demand cost-effective and premium quality transportation solutions.

4.      FEC is organized and existing under the laws of the State of Florida, with its principal place of business in Jacksonville, FL.

5.      Lexington Insurance Company ("Lexington") d/b/a American International Group, Inc. is an insurance company organized and existing under the laws of the State of Delaware with its principal place of business in Boston, MA.

6.      Lexington is part of the AIG family of insurers. AIG is participating in a panel of insurers that have underwritten coverage for FEC on the AIG Policy. AIG is organized and existing under the laws of the State of Delaware with its principal place of business in New York, NY.

7.      Aspen Specialty is an insurance company on the panel of insurers. It is organized and existing under the laws of the State of North Dakota, with its principal place of business in Rocky Hill, CT.

8.      Houston Casualty is an insurance company on the panel of insurers. It is an insurance company organized and existing under the laws of the State of Texas, with its principal place of business in Houston, TX.

9.      Allied World is an insurance company on the panel of insurers. It is an insurance company organized and existing under the laws of the State of New Hampshire, with its principal place of business in New York, NY.

10.      Indian Harbor (XL) is an insurance company on the panel of insurers. It is an insurance company organized and existing under the laws of the State of Delaware, with its principal place of business in Stamford, CT.

11.      Ironshore Specialty is an insurance company on the panel of insurers. It is an insurance company organized and existing under the laws of the State of Arizona, with its principal place of business in Boston, MA.

## STATEMENT OF FACTS

12.      In order to protect itself from potential losses, FEC purchased a commercial property insurance policy from Lexington effective March 1, 2017 (policy number 012944757; hereinafter the "Policy," copy of the Policy attached as Exhibit A).

13.    Collectively, the Insurers have underwritten FEC's coverage on the Policy.

14.    The Policy provided protection to FEC to covers losses that impact FEC's "[r]eal and personal property." Policy, p. 7. It also provided protection to FECH for the "interruption or suspension of the Insured's operations and the consequent reduction of business income caused by or resulting from direct physical loss and/or damage." Policy, p. 20. Loss precipitated by a "Named Windstorm" is a covered "occurrence" under the Policy. Policy, pp. 42, 43-44.

15.    In September 2017, FEC incurred at least $5,605,881 in losses due to Hurricane Irma, an amount to be proven at trial.

16.    Despite timely notice of loss and submission of claim, the Insurers breached their contractual obligations to FEC in bad faith by wrongfully denying FEC's claim.

## Damage and Loss Incurred by FEC Due to Hurricane Irma

17.    On or about August 30, 2017, Hurricane Irma first formed as a storm, gathering strength off the coast of Cape Verde. Irma grew into a Category 5 hurricane as it moved in a northwesterly direction toward North America.

18.    As is protocol, FEC tracked the storm and eventually became convinced of Hurricane Irma's progression toward the coast of Florida.

19.    Following common-sense and professional FEC operational procedures, and adhering to dictates of the Policy, FEC took early action to avert potential physical

property losses and business interruption of a more substantial magnitude than if pre-mitigation did not take place.

20.     Much of FEC's activity centered around early action to preserve the physical integrity of FEC's road crossing gates and to maintain rail safety at those vulnerable crossing areas, which was required to facilitate operational capacity.

21.     Railroads cannot safely operate without gates at rail crossings. These metal protective devices are sufficiently long when lowered electronically to extend across car transit lanes, and they are made of light material so they can be opened and closed rapidly.

22.     Because these gates sheer at wind speeds of around 40 MPH, and because Irma was projected to pack winds of up to 60 MPH at landfall, pre-storm gate removal was necessary to avoid significant property damage to the restraints.

23.     This proactive action of pre-storm gate removal aided the reduction of business interruption and mitigated the risk of personal injury and property loss occasioned by unprotected crossings.

24.     In advance of Irma's arrival, FEC dispatched crews on or about September 7, 2017 to begin unbolting, removing, and storing roughly 600 crossing gates.

25.     FEC incurred about $1.3 million in expenses to remove and store these gates as a pre-hurricane protection.

26.    This work benefitted the Insurers in several ways. First, members of the general public could have been exposed to injury or property damage from flying aluminum from crossing gates should they have sheared in Irma's winds. Second, the cost of replacing gates is appreciably high because of the odd sizing of each gate, and the inability of FEC to efficiently store universal replacements for the sizeable restraints. Third, if gates were to have severed, the interruption to rail traffic from unguarded crossings would have amounted to more highly-significant business interruption losses, chargeable to the Insurers per the Policy.

27.    The proactive gate-removal action by FEC also conserved on crew costs. Had the roughly 600 gates not been removed, and had Hurricane Irma ripped them to shreds, it would have taken FEC several weeks to order, size, and reattach these crossing safeguards.

28.    This lag would have necessitated the deployment of numerous rotations of FEC personnel to direct traffic at the unprotected crossings. Numerous trains would have been compelled to slow their travel to adjust to the lower speeds imposed at human-controlled intersections. This would have added to the total loss that FEC would have presented to the Insurers as a business interruption claim.

29.    Because of FEC's proactive intervention, FEC limited business interruption and experienced minimal physical property loss attributable to Hurricane Irma.

30.    Ultimately, FEC incurred pre-storm gate removal and post-storm re-installation and business interruption expenses of more than $5,605,881, an amount to be proven at trial.

## The Insurers' Denial of Claim

31.    Pursuant to the Policy, FEC submitted a First Notice of Loss on September 15, 2017.

32.    The Insurers collectively retained as their agent third-party administrator Sedgwick to receive information from the insured and its agents and review the claim.

33.    On February 20, 2020 and August 6, 2020, FEC timely submitted a proof of claim to Sedgwick consisting of a detailed schedule with substantial backup documenting over $5.6 million of incurred losses. The Insurers, Sedgwick and FEC thereafter exchanged letters and emails and engaged in discussions, attempting to arrive at a measure of FEC's claim.

34.    By letter dated December 2, 2020, Sedgwick rejected for the Insurers FEC's claim submission (the "Denial Letter," copy attached as Exhibit B).

35.    In the Denial Letter, Sedgwick did not dispute the authenticity or the quantum of those submitted hurricane-related expenses or demand further documentation. Also, the Insurers asserted no Policy exclusions in the Denial Letter. According to the Denial Letter, the Insurers agreed that FEC's total Hurricane Irma loss did in fact amount to at least $5,605,881, an amount to be proven at trial.

36.    The Insurers' refusal to pay the FEC claim has to do with their interpretation of the coverages and the application of any applicable deductibles, not anything errant in the quantum or measurement of FEC's storm damage preservation or business interruption expenses as submitted, a stance the Insurers have not altered in post-denial communications with FEC.

37.    The Denial Letter does indicate, erroneously, that the pre-hurricane preventative expenses in the amount of $1,291,623 that FEC incurred before Hurricane Irma made landfall were categorically barred from coverage under the Policy.

38.    The Denial Letter also indicates that the remainder of the submission of $4,595,368 in losses falls below what the Insurers regard to be the applicable deductible in the Policy. The Policy presents several options for deductibles based on the nature of the loss, and pre-conditions and factual considerations related to it.

39.    To arrive at the determination that FEC's claim failed to satisfy an applicable deductible, the Insurers contended in the Denial Letter that the controlling retention should equal "5% of reported BI/EE value - $98, 786,145." Denial Letter, p. 1, n. (B).

40.    While the Insurers declined to state in the Denial Letter the source of this "BI/EE value" calculation, FEC believes that is the figure for enterprise-wide business interruption losses at FEC – estimated for a 12-month period, not an 11-day storm interruption (September 7 – 18, 2017). This calculation in the Denial Letter is an

inappropriate and bad-faith basis on which to base a deductible rooted contractually in "5% of property values at locations damaged from and as respects Named Windstorm…." Policy, p. 7.

41.    The Denial Letter misapplies the deductible because (1) the $98,786,145 is not 5% of property values at locations "damaged" by Hurricane Irma because FEC's proactive work by FEC eliminated most property damage on its railroad attributable to the storm; (2) the $98,786,145 is not 5% of property values of "locations" impacted because that figure is a whole-enterprise total, and only certain FEC "locations" were actually impacted by Hurricane Irma, not the whole enterprise of FEC's railway; and (3) the business-interruption valuation from which FEC believes the Denial Letter extracted this 5% Named Windstorm valuation is predicated on a 12-month interruption, and Hurricane Irma actually forced only an interruption on FEC of 11 days or so.

42.    Using this badly reasoned application of a Named Windstorm deductible, the Insurers concluded that FEC's submitted claim had to surmount a total of $4,939,307 in order to be compensable. While the Insurers, as noted, had already backed out the $1,291,623 of pre-hurricane expenses it would consider for indemnity, the Insurers then postulated that FEC's remnant claim of roughly $4,595,368 fell about $343,939 short of substantiating a loss that could be covered by the Policy. Once again, the Denial Letter reached this conclusion because it employed a whole-enterprise, non-localized, and whole-year valuation method to arrive at a deductible – one that falsely

manipulated proper measurements in order to keep FEC from achieving a compensable claim. The Insurers had alternative choices for applying a proper and good-faith deductible in the Denial Letter yet they chose to improperly apply the 5% Named Windstorm deductible.

43. After conveying to FEC a denial of claim rooted in wrongly excluded pre-hurricane expenses and an improper measurement of a deductible, Sedgwick then announced two contradictory courses of action.

44. On the one hand, Sedgwick took the position that the Insurers are not in any way bound by the coverage determination of their third-party administrator, Sedgwick. In attempt to buttress that position, the Denial Letter states that Sedgwick's claim analysis is not "to be considered an admission of liability." In keeping with this, the Insurers advised FEC that Sedgwick has no authority "either to bind insurers with respect to coverage, or to interpret, waive, or alter any terms, conditions, or limitations of the Policy." Denial Letter, p. 2. The Insurers have also advised FEC separately that the Sedgwick is not their agent at all, but rather, they contend, Sedgwick is merely an "independent outside adjuster."

45. On the other hand, however, Sedgwick represents in the same Denial Letter that the position Sedgwick relayed in that Denial Letter *is in fact conclusive and binding,* conveying to FEC that the Insurers are "closing their files" regarding FEC's Hurricane Irma loss submission. Denial Letter. P. 2, (referencing as a predicate of this conclusion authorized "discuss[ions]" Sedgwick had with FEC and its agents).

46.     The Insurers cannot have it both ways.  They cannot in good faith be "closing" the FEC Hurricane Irma claim file unless they actually relied on Sedgwick's Denial Letter as a statement of the Insurers' final position on the "measurement" of the claim, and unless they affirmed and embraced the expectation that FEC would treat the Denial Letter as final action by the Insurers.

**The Insurers' Denial Breached the "Sue and Labor" Provision of the Policy**

47.     By underwriting the coverage with FEC, the Insurers agreed to abide by the terms of the issued Policy, including the "sue and labor" provisions of the Policy. This sue and labor provisions states as follows:

> **Expenses to Reduce Loss**
> Policy covers expenses as are necessarily incurred for the purpose of reducing any loss under this policy, however, such expenses shall not exceed the amount by which the loss as covered by this policy is thereby reduced. It is expressly understood and agreed that any expense incurred by the insured as a consequence of a loss covered hereunder to clear the lines, recover, save or preserve property insured shall be covered hereunder.

Policy, p. 14. In the Loss Insured section, the Policy states as follows:

> This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

Policy, p. 20.

48.     The Policy specifies that its "Additional Coverages," which are inclusive of ints sue and labor provisions, are "subject to the Policy provisions," but states they

11

are only subject to *"applicable* exclusions and deductibles ...."* Policy, p. 9 (emphasis added.)

49.    FEC's action of removing gates pre-hurricane was conducted "for the purpose of reducing any loss under this policy," and  was effected to "save or preserve property." Thus FECs gate removal was thus a covered expense per the Policy's sue and labor provisions enumerated in paragraph 47 above.

50.    In bad faith, in the Denial Letter the Insurers and Sedgwick "segregated" – to use their words – out from the coverage the measurement of all expenses that FEC incurred from September 7th to September 9th, stating this was because "Hurricane [Irma] did not make landfall until 09/10/17."   Accordingly, the Denial Letter expressly ignored any coverage for FEC's full sue-and-labor expenses despite the coverage requirements for sue and labor expenses that are detailed on p. 14 and p. 20 of the Policy.

51.     Controlling Florida law fully embraces the concept of reimbursement for and insured's "sue and labor" expenses when an insured's efforts to stem a loss in progress are proximately connected to a natural cause such as a hurricane or tropical storm.

52.    When an insured is confronting "sue and labor" situations, there is no deductible "applicable" where, as here, an insured takes action to preserve insured property that is susceptible to imminent damage or harm in the context of a loss in process precipitated by an external threat such as a storm

12

53.    A "sue and labor" reimbursement rewards action by the insured for taking precautions to prevent property loss when the reduction would benefit both itself and its insurer – with a collateral beneficiary being the general public that could be exposed to harm.  Insureds are incentivized by law to make preventative sue-and-labor investments free from the reach of otherwise applicable policy deductible, provided the efforts meet the precondition of being  expenses incurred to prevent an imminent loss in loss in progress.

54.    Sue-and-labor clauses have their origin in maritime policies, but courts have  greatly expanded them top many other types of insured circumstances. FEC's entire expense of removing gates in anticipation of Hurricane Irma's storm damage is thus fully reimbursable to FEC without any applicable deductible.

55.    The same is the case for the necessary gate reinstallation costs and the crew time to safeguard the crossings preserved during this prevention process, and attendant business interruption loss related to preventative gate removal because (1) the Insurers underwrote "all risk" coverage to FEC (*see* Policy, p. 7); (2) there is no doubt that Hurricane Irma was anything but an "imminent" threat or a "loss in progress" when on September 7, 2017, FEC took action to save the gates by preserving them from likely windstorm damage; (3) there is no doubt that FEC's actions wholly benefitted the Insurers, and not just FEC, and (4) the reinstallation of the gates and the concomitant costs, expenses and delays that accompanied that reinstallation process were part of the act of sue and labor that is embraced and promoted by public policy.

13

**The Insurers' Denial Letter Breached the Policy by Improperly Inventing a
Non-Localized, Whole-System, Year-Long, "Damage"-Based Deductible**

56.    Even if any portion of FEC's claim was in fact susceptible to the
application of a deductible—which is not the case under controlling Florida law—that
Policy "deductible" would not be as the Insurers calculated in the "measurement" they
included in the Denial Letter.

57.    As detailed *infra*, without any good faith basis to do so, the Insurers
applied to FEC's detriment a deductible of 5% of the enterprise value of FEC's lines,
and they improperly based this value on a 12-month non-localized measurement
calculation, rather than using an 11-day or less valuation to reflect accurately the
duration of the business interruption timing claim.

58.    According to the Policy, in the section labelled appropriate
"Deductibles" for non-sue and labor circumstances:

> [i]n each case of loss covered by this Policy, the insurers will be liable only if the
> Insured sustains a loss in a single occurrence greater than the applicable
> deductible specified below....
>
> .... Policy Deductible(s):
>
> .... $750,000 as respects **Railroad Operations** *except 5% of property values
> at locations damaged from and as respects Named Windstorm* including any
> combination of Flood resulting from **Named Windstorm** subject to a
> minimum deductible of $750,000 ....

Policy, p. 7 (emphasis added).

59.    The Insurers' applied to FEC a deductible of "$4,939,307." Demand
Letter, p. 1.  To arrive at this figure, they ignored sue-and-labor protections owed to

14

FEC, as detailed above. They also bypassed proper application of the Deductibles provision to non-sue-and-labor expenses and bypassed consideration of the standard $750,000 deductible. Instead, the Insurers fashioned a draconian retention rooted in the supposed property value of the entire length of FEC's railroad operations over 12-months' time, without isolating the losses solely to any locations actually damaged by Hurricane Irma or limiting the damage period to the 11-day duration of FEC's timing claim.

60.    The Insurers did not in good faith limit themselves to the Policy language of measuring "property values at locations damaged," as the Policy requires if the Insurers wished to attempt to apply this improper Deductible. Rather, jettisoning good faith, the Insurers regarded localized FEC's gate operations during Hurricane Irma to involve the whole FEC line, and  for a whole year of operations.

61.    The Insurers and actions, and those of Sedgwick, were  knowingly improper claim adjustment practices for three reasons: First, FEC's expenses and losses were nearly all preservative and later restorative sue and labor actions, not the result of FEC fixing any "locations damaged" by Hurricane Irma. Accordingly, the 5% deductible is on its face inapplicable in the sue-and-labor context in which, as here, the insured acts preemptively. The Insurers did not point in the Denial Letter to any railroad "locations [that were] damaged from and as respects Named Windstorm [Irma]." They cannot do so otherwise.  FEC's submission was principally for expenses related to advance gate removal, subsequent gate reinstallation, crossing protection

during the re-install process, and related business interruption on account of reconfigured gates and power deficits to them. Because FEC did not experience much if any property "damage" from a "Named Windstorm," then there were no losses in FEC's submitted claim that triggered the deductible applied by the Insurers in the Denial Letter.

62.     Second, as FEC's expense reimbursement request was for pre-hurricane gate removal and reinstallation, and thus pertained to no "property" damage whatsoever, the Insurers could not in good faith trigger a 5%-of-location-damaged-based deductible. Such a deductible would have to be triggered by localized "property" loss in order for such a deductible to apply.  FEC's letters, emails, and discussions supporting the proof of claim and submission pointed to now localized property damage that FEC to use in good faith as the basis of the so-called 5% Named Windstorm deductible.

63.     Third, the Insurers had no reason on the facts presented by FEC to use a whole-enterprise-value calculation over 12 months to determine a deductible. Only the property around 600 rail crossings was implicated in the FEC windstorm claim and these removed and reinstalled gates were not "damaged" at all.  FEC submitted no damage claim pertaining to the entirety of FEC's rail line valuation. Further, the timing losses for which FEC submitted a claim were incurred over a 11-day period or so, not a whole year.  Accordingly, the Insurers appear to have had had no ethical or

good faith factual basis to use a whole-enterprise non-localized property-damaged based 5% valuation to compose the deductible applied in the Denial Letter.

## COUNT I

### (Breach of Contract – "Sue and Labor" Provision)

64.    The allegations in Paragraphs 1-63 are incorporated herein by reference.

65.    The Policy is a valid and enforceable contract between FEC and the Insurers, for which the parties exchanged adequate consideration.

66.    The Insurers agreed to abide by the terms of the Policy, including the "sue and labor" provision presented on page 14 of the Additional Coverages section and on page 20 of the Loss Insured section.

67.    FEC's action of removing gates pre-hurricane was "for the purpose of reducing any loss under this policy," and it was to "save or preserve property."

68.    FEC's gate removal was a covered expense for which no deductible was "applicable" as a matter of public policy and applicable law.

69.    The Insurers' exclusion of sue-and-labor expenses on the contention they were incurred before the "loss period" constitutes a breach of their obligations to cover sue and labor expenses under the Policy.

WHEREFORE, FEC respectfully requests the following:

A.    Actual damages against the Insurers in excess of seventy-five thousand dollars ($75,000.00) in an amount to be determined at trial;

B.    Attorneys' fees;

C.      Pre-judgment interest;

D.      Post-judgment interest; and

E.      Any other relief the Court deems appropriate.

## COUNT II

### (Breach of Contract – Misapplication of Deductible)

70.     The allegations in Paragraphs 1-63 are incorporated herein by reference.

71.     The Policy is a valid and enforceable contract between FEC and the Insurers, for which the parties exchanged adequate consideration.

72.     The Insurers agreed to abide by the terms of the Policy, including the section labelled "Deductibles," which states that "[i]n each case of loss covered by this Policy …

> .... Policy Deductible(s): ....
>
> .... K$750,000 as respects **Railroad Operations** except 5% of property values at locations damaged from and as respects Named Windstorm including any combination of Flood resulting from **Named Windstorm** subject to a minimum deductible of $750,000 ....

73.     The Insurers application of a deductible of 5% of the enterprise value of FEC's lines without any good faith basis to do so constitutes a breach of their obligations under the Policy.

WHEREFORE, FEC respectfully requests the following:

F.      Actual damages against the Insurers in excess of seventy-five thousand dollars ($75,000.00) in an amount to be determined at trial;

G.    Attorney's fees;

H.    Pre-judgment interest;

I.    Post-judgment interest; and

J.    Any other relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury on all issues so triable.

This 28th day of July 2021.


Respectfully submitted,

*/s/ Cameron G. Kynes*
Cameron G. Kynes (FBN 116711)
McGuireWoods LLP
50 N. Laura St., Ste. 3300
Jacksonville, FL 32211
Telephone: (904) 798-3411
Fax: (904) 798-3221
ckynes@mcguirewoods.com