# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

FLORIDA EAST COAST
HOLDINGS CORPORATION,

    Plaintiff,

v.

Case No. 3:21-cv-747-TJC-PDB

LEXINGTON INSURANCE
COMPANY, ASPEN SPECIALITY,
HOUSTON CASUALTY, ALLIED
WORLD, IRONSHORE
SPECIALITY, and INDIAN
HARBOR (XL),

    Defendants.

## O R D E R

Before the Court are cross-motions for summary judgment in this insurance coverage case. Docs. 61, 62. The Court must determine whether losses sustained by a railroad company in connection with Hurricane Irma fall below the company's insurance deductible. The issues are fully briefed, and the Court conducted a hearing on October 23, 2023. Docs. 61, 62, 71, 72, 76, 77, 86, 87.

## Background

Plaintiff Florida East Coast Holdings Corporation (FEC) insured its railroad through a policy with Defendant Lexington Insurance Company. Doc.

1 ¶¶ 3–6; see also Doc. 1-2 (policy). The remaining five Defendants also underwrote the coverage.[1] Doc. 1 ¶¶ 7–11; Doc. 20 ¶¶ 7–11.

FEC's railroads include 600 automatic crossing systems worth between $233,506 and $529,186 apiece, including expensive electronic signaling equipment and gates. See Doc. 61-13 at 10–39 (FEC's summary of property values); Doc. 87 at 48:16–49:20 (transcript from motion hearing). To prevent damage, FEC removed the gates from each crossing as Hurricane Irma approached Florida, stored the gates, and paused railroad operations. Doc. 1 ¶ 24. After the storm, FEC reinstalled the gates and submitted to the insurers a notice of loss for September 7, 2017, (the day the gate removal began) through September 18, 2017, (the last day railroad operations were interrupted). Id. ¶¶ 16, 30, 40.

For the next few years, FEC, the insurers, accountants, and adjusters disagreed over total losses and the deductible. See generally Docs. 1, 61, 62, 71, 72. In August 2020, an accountant for FEC determined the losses totaled $5,605,881, and FEC submitted a claim to the insurers for that amount. Doc. 1 ¶ 35; Doc. 61 at 18; Doc. 62 at 8.

The insurers' adjuster rejected the claimed amount and determined the

---

[1] They are: Aspen Specialty Insurance Company, Houston Casualty Company, Allied World Assurance Company (U.S.) Inc., Indian Harbor Insurance Company, and Ironshore Specialty Insurance Company. Doc. 1 ¶¶ 7–11; Doc. 20 at 1–2.

adjusted amount was below the deductible. See Doc. 1-3 (adjuster's letter). The insurers thus did not pay. Id. FEC filed this suit, alleging two counts of breach of contract. Doc. 1. FEC acknowledges no property damage occurred and bases its claim only on costs of business interruption and the gate removal, storage, and reinstallation. See Doc. 62 at 11–14; Doc. 72 at 13–15; Doc. 80 at 4. Although the parties raise numerous arguments on summary judgment, the dispositive issues are which policy provisions apply to the claim and whether the losses exceed the applicable deductible.

## Policy

In relevant part, the insurance policy contains these provisions:

### DECLARATIONS – SECTION A

. . .

**DEDUCTIBLES**

> In each case of loss covered by this Policy, <u>the Insurers will be liable only if the Insured sustains a loss in a single occurrence greater than the applicable deductible specified below</u>, and only for its share of that greater amount.
>
> Unless otherwise stated below:
>
> A. <u>When this Policy insures more than one property, the deductible will apply against the total loss covered by this Policy in any one occurrence.</u>
>
> B. <u>If two or more deductibles provided in this Policy apply to a single occurrence, the total to be deducted will not exceed the largest deductible applicable, unless otherwise provided.</u>

<u>Policy Deductible(s)</u>

$ 100,000 combined all coverages except:
$ 750,000 as respects Railroad Operations except;
<u>5% of property values at locations damaged from and as respects Named Windstorm</u> including or any combination of Flood resulting from Named Windstorm subject to a minimum deductible of $750,000.

. . .

## PROPERTY DAMAGE – SECTION B

. . .

**<u>Expenses to Reduce Loss</u>**

Policy covers such expenses as are necessarily incurred for the purpose of reducing any loss under this policy, however, such expenses shall not [] exceed the amount by which the loss as covered by this policy is thereby reduced. It is expressly understood and agreed that any expense incurred by the Insured as a consequence of a loss covered hereunder to clear the lines, recover, save or preserve property insured shall be covered hereunder.

. . .

**<u>Protection and Preservation of Property</u>**

This Policy covers:

1) <u>reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured direct physical loss or damage to such insured property.</u>

2) reasonable and necessary:

   a) fire department fire fighting charges imposed as a result of responding to a Fire Department call.

   b) costs incurred of restoring and recharging fire protection systems following an insured loss.

   c) Costs incurred for the water used and any other fire

>   > extinguishing material expended following an insured loss.
>   >
>   > <u>Insured Property covered through this clause shall be added to the direct physical loss or damage otherwise recoverable under this policy, and shall be subject to the applicable deductible, sublimit of liability and policy limit.</u>
>
> . . .
>
> **TIME ELEMENT – SECTION C**
>
> . . .
>
> **Business Interruption/Loss of Income**
>
>   > This policy insured the necessary interruption or suspension of the Insured's operations and the consequent reduction of business income caused by or resulting from direct physical loss and/or damage by a peril not excluded by this policy . . . .
>
> . . .
>
> **Extra Expense**
>
>   > This policy shall insure extra Expense which shall apply to all operations including but not limited to Railroad Operations of the Insured as respects losses where Insured incurs expenses over and above normal expenses in order to continue normal operations following direct physical loss and/or damage by a peril not excluded by this policy . . . .
>
> . . .
>
> **Protection and Preservation of Property – Time Element**
>
>   > <u>This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy</u> provided such action is necessary to prevent immediately impending direct physical loss or damage insured by this Policy at such insured property.
>   >
>   > <u>This Extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred.</u>
>
> . . .

5

Doc. 1-2 at 2, 7, 14, 15, 20–22, 25 (emphasis added).

## Parties' Positions

The insurers argue that only the Section B and Section C "Protection and Preservation of Property" provisions apply, that the Section C provision limits recovery for lost revenue to September 7th through September 9th, and that the proper deductible is 5% of property values. See generally Docs. 61, 71, 76. They rely on FEC's 2017 summary of estimated property values to provide two alternative calculations, the first based on the reported $98,786,145 "Business Interruption Values" and the second based on the reported $219,019,894 "Automatic Crossings" value. Doc. 61 at 20–22; Doc. 76 at 6–8; see also Doc. 61-13 at 3, 10–39 (values summary).

In the Complaint, FEC asserts the losses are covered under the "Expenses to Reduce Loss" provision. Doc. 1 ¶ 47. At summary judgment, FEC argues instead that the "Business Interruption" and "Extra Expense" provisions apply.[2] See generally Docs. 62, 72, 80. Appearing to treat "$750,000 as respects Railroad Operations" and "5% of property values at locations damaged from and as respects [a] Named Windstorm" as two separate deductibles, FEC further argues that the 5% deductible would apply only if

---

[2] The Court does not decide whether FEC sufficiently states a claim for failure to pay under the "Business Interruption" and "Extra Expense" provisions. Even if the allegations are sufficient, for the reasons stated later in this Order, those provisions do not cover the losses.

6

property damage occurred, and none occurred here. See generally Docs. 62, 72, 80.

The parties continue to dispute the precise losses. Compare Docs. 61, 71, 76 (insurers' filings), with Docs. 62, 72, 80 (FEC's filings). By any valuation, the loss is greater than $750,000 but less than $10,950,994.70 (5% of the minimum property values as calculated from the amounts provided by FEC).[3]

## Law

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "All evidence and factual inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-moving party." Hardigree v. Lofton, 992 F.3d 1216, 1223 (11th Cir. 2021).

In a diversity case, a federal court applies federal procedural law and state substantive law. Hanna v. Plumer, 380 U.S. 460, 465 (1965); Horowitch v. Diamond Aircraft Indus., Inc., 645 F.3d 1254, 1257 (11th Cir. 2011). Where the parties do not address choice of law in a contract, the court presumes the substantive law of the forum state controls. Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989). Because this is a diversity case and the

---

[3] FEC's claimed amount ($5,605,881) is more than 5% of the value of business interruption ($98,786,145), but for the reasons explained later in this Order, that is not the correct way to calculate the deductible.

7

parties do not address choice of law in the insurance contract, Florida substantive law applies.

In Florida, "insurance contracts must be construed in accordance with the plain language of the policy." Swire Pacific Holdings, Inc. v. Zurich Ins. Co., 845 So. 2d 161, 165 (Fla. 2003). "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and . . . another limiting coverage, the insurance policy is considered ambiguous." Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000).

"Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." Id. "Likewise, ambiguous insurance policy exclusions are construed against the drafter and in favor of the insured. In fact, exclusionary clauses are construed even more strictly against the insurer than coverage clauses." Id. (internal citation omitted). But "only when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction is the rule apposite." Swire, 845 So. 2d at 165 (cleaned up). The rule "does not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." Id. (internal citations omitted).

A complex provision requiring analysis is not automatically ambiguous. Id. And "in construing insurance policies, courts should read each policy as a

whole, endeavoring to give every provision its full meaning and operative effect." Auto-Owners Ins. Co., 756, So. 2d at 34. "A contract is not to be read so as to make one section superfluous, and so all the various provisions of a contract must be so construed as to give effect to each." Universal Prop. & Cas. Ins. Co. v. Johnson, 114 So. 3d 1031, 1036 (Fla. 1sts DCA 2013) (cleaned up); accord Excelsior Ins. Co. v. Pomona Park Bar & Package Store, 369 So. 2d 938, 942 (Fla. 1979); Sidiq v. Tower Hill Select Ins. Co., 276 So. 3d 822, 826 (Fla. 4th DCA 2019).

"Although the insured bears the burden of proving that a claim is covered by the insurance policy, the burden of proving an exclusion to coverage is on the insurer. However, if there is an exception to the exclusion, the burden returns to the insured to prove the exception and show coverage." Diamond State Ins. Co. v. Boys' Home Ass'n, 172 F. Supp. 3d 1326, 1334 (M.D. Fla. 2016) (cleaned up) (applying Florida law). Part of the insured's burden to prove coverage includes proving that the claim exceeds the deductible. Exhibitor, Inc. v. Nationwide Mut. Fire Ins. Co., 494 So. 2d 288, 289 (Fla. 1st DCA 1986).

## Analysis

Applying these legal principles, summary judgment is appropriate: the parties dispute no material facts, debating instead only the interpretation and application of various provisions in the insurance policy. Ultimately, FEC fails

to meet its burden of proving the claim exceeds the deductible.[4]

### a. *Applicable Provisions*

Based on the plain language of the policy, only the Section B and Section C "Protection and Preservation of Property" provisions apply. The Section B provision explicitly covers "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property"—which is exactly what the gate-related costs were.[5] The Section C provision covers "actual loss sustained" from temporary protection and preservation of property—which applies to the business revenue lost from the removal of the gates. Because the Section C provision limits recovery to forty-eight hours before to forty-eight hours after FEC first began taking protective or preservative measures—i.e., forty-eight hours before and after September 7th—the policy covers lost business only from September 7th through September 9th.[6]

The "Business Interruption" and "Extra Expense" provisions do not

---

[4]Even if the insurers had the burden of proof, the outcome is the same: under the policy and undisputed facts, the deductible exceeds the claim.

[5] FEC argues that the Section B "Protection and Preservation of Property" provision applies only to protecting against fire. Doc. 80 at 14. This is inaccurate. The provision includes two subsections, one for general protection and preservation measures and the other for fire-related protection and preservation measures. Pp. 4–5, supra; Doc. 1-2 at 15.

[6]There was no lost revenue on September 5th and 6th. See Doc. 1 ¶ 24; Doc. 1-3.

apply because both are contingent on "direct physical loss and/or damage by a peril," and the parties agree that Hurricane Irma caused no direct physical loss or damage. See Doc. 62 at 11–14; Doc. 72 at 13–15; Doc. 80 at 4; Doc. 87 at 41:5–41:7.

To the extent FEC intends to rely on the "Expenses to Reduce Loss" provision, that provision explicitly involves reduction—not prevention—of loss. To treat "reduce" and "prevent" interchangeably would render the "Protection and Preservation of Property" provisions superfluous and fail to give each policy provision effect. Because FEC argues that its expenses were undertaken to prevent damage to the gates, not to reduce loss from damage that had already occurred, see Docs. 62, 72, 80, 87, the "Expenses to Reduce Loss" provision is inapplicable.

### b. *Deductible*

FEC argues the deductible is $750,000 because no property damage occurred. Doc. 62 at 11–13. This interpretation is incorrect because the applicable provisions trigger the 5% "Named Windstorm" hurricane exception to the general $750,000 deductible even without actual property damage.[7]

Under the Section B "Protection and Preservation of Property" provision (applicable to the gate removal, storage, and reinstallation), protection and

---

[7] There is no dispute that Hurricane Irma is a "Named Windstorm" under the policy.

11

preservation costs "shall be added to the direct physical loss or damage otherwise recoverable under this policy, and subject to the applicable deductible[.]"[8] Doc. 1-2 at 21. The first part of this provision—"shall be added to the direct physical loss or damage otherwise recoverable under this policy"—establishes that damages under this provision are calculated by adding protection and preservation costs to any direct physical loss. The second part of the provision—"and subject to the applicable deductible"—establishes that because the damages are combined, the protection and preservation costs are subject to the same deductible as direct physical loss (even if, as here, there is no physical loss). The deductible for direct physical loss—and thus for protection and preservation costs—is the 5% hurricane exception.[9]

Under the Section C "Protection and Preservation of Property" provision (applicable to the lost business from September 7th through September 9th), the coverage is "subject to the deductible provisions <u>that would have applied</u>

---

[8]The provision's exact wording is, "<u>Insured Property covered through this clause</u> shall be added . . . ." Doc. 1-2 at 21 (emphasis added). The clause, however, covers only <u>costs</u> for actions to temporarily protect or preserve insured property. <u>Id.</u> The only way to read the policy to give it proper effect is to interpret "Insured Property covered through this clause" as the costs the clause insures—here, the gate removal, storage, and reinstallation.

[9]That FEC claims no direct physical loss affects only FEC's total claimed damages, not the meaning of the provision or applicability of the hurricane exception.

12

had the physical loss or damage occurred." Id. at 31 (emphasis added). Because the gates were removed to prevent property damage in Hurricane Irma, the 5% hurricane exception is the deductible that would have applied had damage occurred, and the lost business resulting from the gate removal is also subject to that deductible.

Because only the Section B and the Section C "Protection and Preservation of Property" provisions apply and both trigger the hurricane exception, the correct deductible is "5% of property values at locations damaged from and as respects [a] Named Windstorm[.]" Doc. 1-2 at 13.

The parties have not provided the total property values for all 600 affected locations, but at a minimum, those locations include the value of the automatic crossing systems, totaling $219,019,894. This figure was provided by FEC and is undisputed by the insurers. See Doc. 61-13 at 3.[10] At the very least, then, the applicable deductible is 5% of that number, totaling $10,950,994.70.[11]

---

[10]At the October 23, 2023, motion hearing, counsel for FEC suggested that only the value of the gates—removed from the rest of the automatic crossings systems—should be used in this percentage calculation. Doc. 87 at 48:16–49:14. This argument is unpersuasive. The deductible is calculated from the property values of the locations affected by a hurricane, not simply the property protected. Moreover, FEC has provided no evidence that it ever valued the gates separately from the rest of the system, either for this case or in general, and indeed FEC disclaimed any such obligation. Id. at 49:15–49:20.

[11]The insurers present both the value of the automatic crossing systems and the value of business interruption (also provided by FEC, see Doc. 61-13

13

### c. *Value of the Claim*

FEC submitted a claim for $5,605,881, Doc. 1 ¶ 35; Doc. 61 ¶ 18; Doc. 62 at 8, but that claim included the value of lost business from September 7th through September 18th, and, as explained above, only the value of lost business from September 7th through September 9th is covered under the policy. The insurers identify that amount as $1,291,823, Doc. 1-3 at 1; Doc. 61 at 18, 21; and FEC does not dispute that amount (disputing only the validity of the insurers' refusal to pay it), see Doc. 62 at 21, 23; Doc. 72 at 4–5; Doc. 77 at 11. Subtracting the value of lost business from September 10th through September 18th and assuming without deciding that the remaining claimed losses are accurate and recoverable, the total claim is $3,509,281. See Doc. 1-3. The loss is thus $7,441,713.70 below the deductible. And even if the total claimed loss—$5,605,881—were recoverable, the claimed loss would still be $5,345,113.70 below the deductible.

## Conclusion

Because the maximum possible claim is below the minimum possible deductible, the insurers had no obligation to pay FEC, are not in breach of the

---

at 3) as the value from which to calculate the 5%. See Doc. 61 at 20–22. Business interruption values are not property values of affected locations and thus by the language of the policy cannot be included in the calculation. But even if the deductible were properly calculated from the value of business interruption, under the correct valuation of the claim, FEC would not be entitled to recovery.

insurance contract, and are entitled to summary judgment.[12]

These sophisticated parties could have created an insurance policy that did not require the mental gymnastics that this one does to determine coverage. Beginning in 2017, the two sides struggled to define the coverage problem and took shifting positions on coverage and how to calculate the deductible. Even once in litigation, the parties' respective positions have continued to "evolve." The Court has nevertheless endeavored to work through all that and correctly apply the policy to the undisputed facts.

Accordingly, it is hereby

**ORDERED:**

1. The Defendants' Motion for Summary Judgment, Doc. 61, is **GRANTED**.

2. FEC's Motion for Summary Judgment, Doc. 62, is **DENIED**.

3. The clerk is **DIRECTED** to enter judgment in favor of Lexington Insurance Company, Aspen Specialty Insurance Company, Houston Casualty Company, Allied World Assurance Company (U.S.) Inc., Indian Harbor Insurance Company, and Ironshore Specialty Insurance Company and against Florida East Coast Holdings Corporation, terminate the pending motion and deadlines, and close the file.

---

[12]The Court has fully considered the parties' remaining arguments, but because the issues already analyzed are dispositive, the Court does not address them.

**DONE AND ORDERED** in Jacksonville, Florida, the 7th day of February, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

vng

Copies to:

Counsel of record

16